UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESPER FRENCH,

        Plaintiff,                      Civil Action No. 4:12-cv-12835

    v.                                    District Judge Gershwin A. Drain
                                             Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION TO
DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12] AND
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

Plaintiff Esper French appeals Defendant Commissioner of Social Security's ("Commissioner") denial of her applications for disability insurance benefits and supplemental security income. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 12, 14). For the reasons set forth below, this Court finds that substantial evidence supports the Commissioner's decision. The Court therefore **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (Dkt. 12) be **DENIED**, that Defendant's Motion for Summary Judgment (Dkt. 14) be **GRANTED**, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be **AFFIRMED**.

## I. BACKGROUND

Plaintiff was 52 years old on the date she alleges she became disabled.[1] (Tr. 154.) Plaintiff graduated from high school and completed some college work. (Tr. 81.) She previously worked as a computer-aided drafter (CAD), a general laborer, and as a care giver. (81-85.) She alleges that she cannot work due to her depression, gender dysphoria and deafness. (Tr. 75-76.)

### A. Procedural History

On November 5, 2008, Plaintiff applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") asserting that she became unable to work on January 2, 2006. (Tr. 172-80.) The Commissioner initially denied Plaintiff's disability application on May 16, 2009. (Tr. 87-88.) Plaintiff then requested an administrative hearing, and on September 27, 2010, she appeared with counsel before Administrative Law Judge Timothy C. Scallen, who considered her case *de novo*.[2] (Tr. 61-86.) Vocational expert Elizabeth A. Pasikowski also appeared at the hearing. (*Id*.) In an October 20, 2010 decision, ALJ Scallen found that Plaintiff was not disabled. (*See* Tr. 32.) The ALJ's decision became the final decision of the Commissioner on April 26, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1-5.) Plaintiff filed this suit on June 27, 2012. (Dkt. 1, Compl.)

### B. Medical Evidence

In November 1997, records from Foote Hospital show that Plaintiff was hospitalized for psychiatric issues. (Tr. 334-40.) An assessment at that time indicated depression, suicidal ideation,

---

[1] In or around 2001, Plaintiff underwent a trans-gender surgery to become female. Plaintiff is referred to herein as "she" when referring to evidence post-dating the gender change.

[2] An earlier hearing on April 26, 2010 was adjourned so that Plaintiff could obtain representation. (Tr. 47-60.) ALJ Scallen also presided over the first, abbreviated hearing. (*Id*.)

and trans-sexual disorder/gender identity disorder. (Tr. 336.)

On February 19, 1998, Plaintiff was admitted to the hospital after a self-castration attempt. (Tr. 368.) Hospital notes indicate that Plaintiff wanted a sex change operation, but was unable to find a physician to perform it. (*Id*.) Plaintiff was taking Premarin — a hormone replacement therapy most commonly used in post-menopausal women. (*Id*.) Plaintiff underwent a surgical procedure to debride his scrotum, evacuate the clot, and properly close the wound. (Tr. 370.)

On May 2, 1998, Plaintiff was admitted to the hospital after attempting to amputate his left testicle. (Tr. 361.) Emergency room notes from May 29, 1998 indicate that Plaintiff had undergone a sexual reassignment surgery and continued to undergo hormonal therapy.[3] (Tr. 405.) Plaintiff wanted to speak to someone in the psychiatric unit regarding his mood swings, volatile moods, and fears of hurting himself. (Tr. 405.) Emergency room notes state that Plaintiff's symptoms were partly due to the hormone therapy, and also to the adjustment to his new female role. (Tr. 406.) Plaintiff was diagnosed with adjustment disorder and was instructed to continue outpatient therapy and to return if symptoms worsened. (*Id*.)

On August 27, 2000, Plaintiff was admitted to the hospital for depression. (Tr. 392-93.) Plaintiff reported feeling depressed and frustrated with the way his coworkers were treating him because of changing his identity to a woman. (Tr. 392.) Plaintiff denied suicidal or homicidal ideation. (*Id*.) Plaintiff was diagnosed with adjustment disorder, depressed mood and gender identity disorder and was advised to follow-up with counseling. (Tr. 393.) Plaintiff was also given instructions to return if symptoms worsened or persisted. (*Id*.)

---

[3] These notes likely reflect Plaintiff's self-castration attempts, as formal trans-gender surgery occurred in or around 2001.

3

On September 30, 2000, a bone density test of Plaintiff's lumbar spine and left hip was performed. (Tr. 390-91.) Testing indicated osteopenia of the lumbar spine with a slightly increased risk of pathological fracture. (Tr. 391.) Results also showed osteopenia of the left hip with a slightly increased risk for pathological fracture. (*Id.*)

In February 2001, emergency room records indicate that Plaintiff continued to pursue a sex change — from male to female. (Tr. 377.) Plaintiff made comments indicating that she believed that she was a "joke" and that "no one care[d] if [she was] dead or alive." (*Id.*) The emergency room physician indicated that Plaintiff also had suicidal ideation. (Tr. 378.)

On April 8, 2009, Dr. Eugene Rontal examined Plaintiff's hearing capacity. (Tr. 250.) Dr. Rontal reported that Plaintiff had worn hearing aids, but had lost them. (*Id.*) The examination revealed normal tympanic membranes and ear canals. (*Id.*) An audiogram demonstrated a moderate sensorineural hearing loss in both ears. (*Id.*) With a hearing aid, Plaintiff had 96% discrimination at 50dB. (*Id.*) Dr. Rontal opined that Plaintiff had bilateral sensorineural hearing loss of a hereditary origin. (*Id.*) Dr. Rontal further believed that a hearing aid was the only treatment available. (*Id.*)

On April 24, 2009, Michele Bridges prepared a case analysis for the State concluding that Plaintiff would be able to perform some type of low skilled work that did not heavily rely on hearing. (Tr. 252.) Ms. Bridges also concluded that working with the public, working in a fast food setting that relies heavily on hearing, or work requiring phone use would be difficult. (*Id.*)

On April 27, 2009, Dr. Donald Kuiper completed a physical residual functional capacity assessment. In it, Dr. Kuiper opined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit for

a total of about 6 hours in an 8-hour workday, and was unlimited in her ability to push and/or pull. (Tr. 242.) Dr. Kuiper noted no postural, manipulative, visual, communicative or environmental limitations. (Tr. 243-44.) After indicating that Plaintiff had no communication limitations, Dr. Kupier concluded that Plaintiff "retains sufficient hearing to be able to avoid normal workplace hazards and understand occasional oral instructions." (Tr. 245.) Dr. Kuiper noted an audiogram and ENT exam dated April 8, 2009 which demonstrated a non-listing level hearing and discrimination limitation. (Tr. 248.) Further, Dr. Kupier reported that an audiogram performed in 2006 confirmed the same level of limitation. (*Id.*)

On August 23, 2010, clinical therapist Bernadine McClung evaluated Plaintiff and determined that Plaintiff had gender identity disorder together with dysthymic disorder depressed mood. (Tr. 433.) Ms. McClung assessed Plaintiff's Global Assessment Functional (GAF) Scale score at 30. (*Id.*) Moreover, Ms. McClung concluded that Plaintiff exhibited "[s]erious impairment in judgment, preoccupation with becoming and looking like a female, suicidal ideation, [and an] inability to function in almost all areas." (*Id.*) Ms. McClung further noted that Plaintiff, "[l]ack[ed] motivation to get out of bed, [and was] unable to obtain and keep a job." (*Id.*)

On September 23, 2010, Jennifer Turecki-Kaiser, MA, prepared an initial vocational assessment (IVA) to determine Plaintiff's ability to participate in vocational rehabilitation as it related to Plaintiff's ability to return to gainful employment. (Tr. 434-37.) Ms. Turecki indicated that Plaintiff was teaching herself to read lips. (Tr. 435.) Despite this, Ms. Turecki had to repeat and rephrase herself numerous times throughout the interview. (*Id.*) Ms. Turecki noted that Plaintiff had been diagnosed with moderate, bilateral hearing loss. (*Id.*) Ms. Tuercki also noted that in 2006, Plaintiff's hearing loss rose to the level of disability. (*Id.*) Ms. Turecki pointed out Plaintiff's

numerous unskilled labor positions and that Plaintiff was "let go" from numerous positions due to her hearing loss and gender modification issues. (*Id*.) Ms. Turecki also noted that Plaintiff was "harassed, ridiculed and at times, felt threatened by others due to her gender reassignment." (*Id*.) Ms. Turecki concluded that Plaintiff's past work was at the unskilled or semi-skilled level with the highest specific vocational preparation of 3. (Tr. 435.) She noted no transferrable skills from Plaintiff's past work. (*Id*.) As such, based on education and skill level, Ms. Turecki concluded that Plaintiff was a candidate for unskilled work only. (*Id*.) With Plaintiff's hearing loss, Ms. Turecki also concluded that only jobs that did not require hearing should be considered. (*Id*.) After reviewing Dr. Gray's September 20, 2010 RFC assessment[4], Ms. McClung's report, Ms. Bridges' assessment, and taking into account Plaintiff's hearing loss and trans-gender issues, Ms. Turecki concluded that "her impairments and symptoms [] would make gainful competitive employment a non-realistic goal." (Tr. 436.)

### C. Testimony at the Hearing Before the ALJ

#### 1. *Plaintiff's Testimony*

Plaintiff is trans-gendered female. She lives with two roommates. (Tr. 76.) Plaintiff reported that she did most of the housework, although one of her roommates was a hoarder and did not allow Plaintiff to pick up any of her belongings. (Tr. 77.) Plaintiff also reported that she cooked all of the meals. Plaintiff reported that she watched television; however, because of her hearing loss, she directed the sound through a walkman as high as she can get it. (*Id*.) Plaintiff reported being active socially with her roommates, going to movies, parks, coffee houses, and open microphone

---

[4] Dr. Gray's RFC assessment, while noted in Ms. McClung's report, was not included in the administrative record.

nights. (Tr. 77-78.) Plaintiff also reported reading science fiction and collecting Star Trek memorabilia. (Tr. 79.)

Plaintiff reported that her hearing aids were stolen from her purse and that she had not replaced them. (Tr. 63-64.) Plaintiff reported having no insurance to pay for replacement hearing aids. (Tr. 64.) Without the assistance of her hearing aids, Plaintiff testified that she communicated through reading lips and by using some sign language. (Tr. 63-64.) Plaintiff testified that she was only able to understand about 40 to 50 percent of what is going on around her due to her lack of hearing. (Tr. 67.) Plaintiff reported that she was afraid to drive because she cannot hear a car horn and felt she was a hazard to people on the road. (*Id*.) Plaintiff reported that the last time she drove was in 2008. (*Id*.) Plaintiff testified that the last time she worked was in 2008 as a care giver for an autistic child. (Tr. 68.) She testified that she only worked for three or four weeks before quitting because she felt as though she was more of a burden than a help. (Tr. 68.) Before that, Plaintiff reported that she worked for a temporary service at a factory. (*Id*.) However, despite typically making a good first impression on temporary employers, Plaintiff testified that soon employers would realize that she could not pay attention and her supervisors would get very upset with her and would ask her to leave the building. (Tr. 74.)

Plaintiff also reported upsetting experiences associated with her gender change from 1998 until 2006. (Tr. 69.) Plaintiff testified that people would make comments like: "it might be better off if [she would] just put the gun to [her] own head and save some heterosexual the need to go to prison for the rest of his life." (Tr. 70.) Plaintiff reported that she got to a point in her gender dysphoria, that she castrated herself. (Tr. 70.) Due to the lack of understanding of the subject, Plaintiff reported that this is not uncommon within the trans-gender community. (*Id*.) Plaintiff

7

reported that she became disabled on January 2, 2006. (Tr. 71.) Despite this, Plaintiff attempted to continue working; however, she reported that her hearing remained compromised. (Tr. 71.) Plaintiff testified that the buzzing she experienced in her ears affects her concentration. (Tr. 73.) Plaintiff did not take any medications for her depression. (Tr. 73.) Plaintiff did, however, report taking hormone therapy medication. (Tr. 73.)

### 2. *The Vocational Expert's Testimony*

The ALJ solicited testimony from a vocational expert ("VE") about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of

> performing all exertional demands, but has the following nonexertional limitations: first of all, avoiding concentrated exposure to excessive noise -- I'm going to say simple, routine, repetitive tasks for the reason that her concentration is interrupted by not only the constant buzzing the way you've said it in your ear which interferes with concentration, but also the psychological problems as well, no interaction with the public, occasional interaction with coworkers, which requires only communication at close distances, and limit to occasional oral instructions.

(Tr. 82.) The VE testified that the general laborer position would apply. (Tr. 83.) However, if there was a restriction of not being able to interact at all with co-workers, then the general laborer position would not apply. (*Id*.) The ALJ then asked if the position could allow for using headphones to drown out noise. (*Id*.) The VE responded that it would not. (*Id*.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Scallen found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of January 2, 2006. (Tr. 24.) At step two, he found that

9

Plaintiff had the following severe impairment: deafness. (*Id.*) Next, the ALJ concluded that this impairment did not meet or medically equal a listed impairment. (Tr. 26.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "a full range of work at all exertional levels but with the following nonexertional limitations: avoid concentrated exposure to excessive noise; simple, routine, repetitive tasks; no interaction with the public; occasional interaction with co-workers; tasks which only require communication at close contact." (*Id.*) At step four, the ALJ found that Plaintiff was able to perform her past work as a general laborer. (Tr. 30.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act. (*Id.*)

### III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th

Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Plaintiff raises two claims of error — first, that the ALJ failed to properly determine the effects of her hearing loss on her ability to work; and second, that the ALJ improperly omitted depression and gender identity disorder from the list of severe impairments at step two.

### A. The ALJ Properly Determined The Effects Of Plaintiff's Hearing Loss On Her Ability To Work

Plaintiff argues that the ALJ failed to properly determine the effects of her hearing loss on her ability to work. (Pl.'s Mot. Summ. J, at 7-10.) This Court disagrees and concludes that the ALJ's determination that Plaintiff could return to work as a general laborer is supported by substantial evidence.

11

The ALJ accommodated Plaintiff's hearing problems by including limitations in the RFC including avoidance of concentrated exposure to excessive noise, communication at close range (presumably to accommodate her need to read lips), no interaction with the public, and only occasional interaction with co-workers. (Tr. 26.) Moreover, ALJ Scallen accommodated the "buzzing" in Plaintiff's ears which reportedly affected her concentration by limiting Plaintiff to jobs with "simple, routine, repetitive tasks . . ." (*Id.*)

To support these limitations, the ALJ noted the April 8, 2009 consultative examination by ENT specialist Dr. Eugene Rontal, who observed no reports of tinnitus, aural discharge, or dizziness. (Tr. 28, 250.) The ALJ also noted that the examination revealed normal tympanic membranes and ear canals, and that an audiogram demonstrated moderate sensorineural hearing loss in both ears. (Tr. 28, 250.) ALJ Scallen further noted that although a hearing aid brought the Plaintiff's hearing discrimination to 96% at 50dB, Plaintiff reported losing her hearing aids and has not replaced them. (Tr. 28, 250.) The ALJ noted that a 2006 audiogram confirmed the same level of limitation. (Tr. 24, 248.) These objective findings, the ALJ concluded, demonstrated that Plaintiff had a non-listing level hearing and discrimination limitation. (Tr. 29.)

Plaintiff claims that it was error for the ALJ to consider a lack of treatment for her hearing loss; however, SSR 96-7p instructs that "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *See also Gwizdala v. Comm'r of Soc. Sec.*, No. 98-1525, 1999 WL 777534, at *5 (6th Cir. Sept. 16, 1999) (ALJ may consider claimant's refusal to adhere to medical recommendations, including the use of hearing aids).

Plaintiff also complains that the ALJ failed to consider evidence that she lacked the insurance

12

to replace the allegedly stolen hearing aids. (Pl.'s Mot. Summ. J, at 8.) However, Plaintiff brings forth no evidence establishing that she could not have afforded replacement hearing aids through insurance or other means. On this point, this Court has recently concluded that it is proper for an ALJ to consider a claimant's failure to seek emergency room treatment or low cost health care options. *See Hashemi v. Comm'r of Soc. Sec.*, No. 11-13629, 2012 WL 3759033, at *13 (E.D. Mich. Aug. 6 2012).

The ALJ also noted that Plaintiff sought no other treatment or monitoring for her hearing loss, even on an emergency basis, which suggests that her hearing loss was not as severe as alleged. Further, the ALJ noted that Plaintiff was able to effectively communicate by lip reading — and did so during the administrative hearing in this case — without the need for any kind of interpretative assistance. (Tr. 64.)

Relatedly, Plaintiff claims that substantial evidence does not support the ALJ's conclusion that she can return to work as a general laborer. Plaintiff argues that the RFC limitation that she "avoid concentrated exposure to excessive noise" coupled with her testimony at the hearing regarding the noise in the factory in which she worked, preclude a return to her prior work as a general laborer. (*See* Tr. 68.)

But Plaintiff's argument has been rejected by the Sixth Circuit. In *Studaway v. Sec'y of Health & Human Servs.*, 815 F.2d 1074, 1076 (6th Cir. 1987), the Sixth Circuit held that the Act requires that a plaintiff show his impairments are "so severe that he is 'unable to do his previous work. . . .'" The Court specified: "[h]e must prove an inability to return to his former *type* of work and not just to his former job." *Id.* (emphasis in original) (internal quotation marks omitted); *accord Clendening v. Comm'r of Soc. Sec.*, 482 F. App'x 93, *7 (6th Cir. 2012) ("The relevant inquiry is

whether [the claimant] could still perform that type of work and not necessarily the specific job that he had in the past."); *see also Villa v. Heckler*, 797 F.2d 794, 798 (9th Cir. 1986); *Gray v. Heckler*, 760 F.2d 369, 372 (1st Cir. 1985); *De Loathe v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1983); *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981). Because the VE testified that general laborer work existed at a level consistent with Plaintiff's RFC, this Court is compelled to affirm. *See Studaway*, 815 F.2d at 1076.

### B. Severe Impairments

At step two the ALJ determined that Plaintiff had one severe impairment, deafness. (Tr. 24.) Plaintiff contends that the ALJ improperly omitted depression and gender identity disorder from the list of severe impairments. (Pl.'s Mot. Summ. J at 10-12.) However, Plaintiff fails to recognize that once step two is "cleared" by finding that some severe impairment exists — in this case, deafness — the ALJ must then consider a plaintiff's "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008) "The fact that some of [a plaintiff's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Id.* Consequently, any alleged omission of Plaintiff's depression and/or gender identity disorder from the list of severe impairments does not necessarily undermine the ALJ's decision. *See Anthony*, 266 Fed. App'x at 457; *Talos v. Comm'r of Soc. Sec.*, No. 11-13207, 2012 WL 1392156, at *8 (E.D. Mich. Mar. 26, 2012); *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

14

The Court has reviewed the ALJ's decision and concludes that he properly considered Plaintiff's depression and gender identity disorder in the remaining steps of the sequential analysis.[5] Specifically, the ALJ discussed Plaintiff's mental health treatment during 1997 for depression and suicidal ideation. (Tr. 28.) Next, the ALJ discussed, in detail, Plaintiff's emergency room visits during February and May 1998 after he attempted to remove his testicles. (*Id.*) ALJ Scallen noted Plaintiff's history of gender dysphoria, identifying as a transgender while seeking a sex change operation. (*Id.*) ALJ Scallen noted a break in treatment until August 2000, at which time Plaintiff presented to the emergency room exhibiting symptoms of depression regarding his sexual identity, but denied suicidal ideation. (*Id.*) ALJ Scallen noted Plaintiff's return to the emergency room in February 2001 with suicidal ideation, but was discharged. (*Id.*) ALJ Scallen also noted that Plaintiff worked for years with the noted conditions. (*Id.*) And, importantly, ALJ Scallen identified no records of treatment for Plaintiff's mental health conditions since the alleged onset date of disability. (Tr. 28-29.)

This Court concludes that the ALJ properly considered Plaintiff's mental health impairments and a failure to find that Plaintiff's depression or gender identity disorder constituted a severe impairment at step two does not constitute reversible error.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds substantial evidence supports the Commissioner's decision. The Court therefore **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (Dkt. 12) be **DENIED**, that Defendant's Motion for Summary Judgment (Dkt.

---

[5] The ALJ rated the severity of Plaintiff's mental impairments and the RFC reflects the degree of limitation the ALJ found in the "paragraph B" mental function analysis. (Tr. 24-26.)

14) be **GRANTED**, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be **AFFIRMED**.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

                          s/Laurie J. Michelson
                          LAURIE J. MICHELSON
                          UNITED STATES MAGISTRATE JUDGE

Dated: March 12, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 12, 2013.

                                                s/Jane Johnson
                                                Deputy Clerk